RIAN LEE THURMAN *v.* STATE OF INDIANA.

[No. 2-473A100. Filed November 27, 1974. Rehearing denied December 18, 1974. Transfer denied February 21, 1975.]

David F. McNamar, Steers, Klee, Sullivan & LeMay, of Indianapolis, for appellant.

Theodore L. Sendak, Attorney General, Robert A. Zaban, Deputy Attorney General, for appellee.

SULLIVAN, P.J.—Thurman appeals from convictions on two counts of possession of narcotics. The primary issues are (1) the propriety of an amendment to the affidavit as to the date of the offense; (2) the validity of the search which resulted in a seizure of the drugs; (3) chain of custody; and (4) whether the evidence was sufficient to sustain the judgment.

In reviewing the evidence on appeal, we will not weigh the evidence nor judge the credibility of witnesses, but will look only to the evidence most favorable to the State, together with all reasonable inferences to be drawn therefrom. The evidence most favorable to the State here reveals the following facts:

Indianapolis Police Officers Robertson and Brenton received information from a reliable informant that narcotics were being kept and sold at an apartment at 1408 North Broadway in Indianapolis and that Thurman lived in that apartment.

On November 14, 1971, the officers arrived at 1408 North Broadway, searched their informant, and directed him to make a purchase of narcotics after providing him with $10.00. The officers stood in the hallway watching as the informant knocked on the door and, after the door was partially opened, made the purchase. Because the door was only partially opened, the officers were unable to fully see the person inside

the apartment who accepted the money and delivered a packet to the informant.

The informant immediately handed the packet to the officers, who took it to their car, performed a field test and concluded that the contents were an opium derivative.

The officers attempted to obtain a search warrant from a judge but were unable to contact him, it being a Sunday afternoon.

Upon returning to the apartment a few minutes later, the officers knocked on the door. When it was answered by one later identified as Willie Weber, the officers identified themselves whereupon Weber slammed the door.[1]

The officers forced open the door and pursued Weber into a back bedroom, where he was prevented from exiting via a fire escape. Weber was placed under arrest.

The defendant Thurman was lying in the bed in the room in which Weber was arrested. In searching the immediate area, the officers found 85 packets of suspected narcotics beneath the pillow under Thurman's head.

Thurman was placed under arrest and after being advised of his rights, admitted that he rented the apartment and that the narcotics were his.

The next day, November 15, 1971, Thurman was charged in two affidavits with violations of the 1935 Narcotic Act, for possession of heroin and possession of cocaine. The original charging affidavits correctly recited the date of the offenses as November 14, 1971.

On September 5, 1972, the prosecution filed a single amended affidavit charging the same conduct in two counts. The amended affidavit contained a typographical error; it stated that the crimes had occurred on November 14, *1972*.

---

1. The evidence established that it was Weber who had made the narcotic sale observed by the officers and in response to a specific question from defendant's counsel upon cross-examination that Weber had pleaded guilty to charges arising from the incident.

The case was tried on November 13, 1972 in Marion Criminal Court Room 3, without the intervention of a jury. The facts as above described were established by testimony. In seeking to establish chain of custody of the narcotics, Officer Robertson testified that he had placed the drugs in an envelope, sealed and marked it, and placed it in the police property room drop box. An officer assigned to the property room testified that two keys were necessary in order to open the narcotics box: one was in the possession of the officer on duty in the property room, the other was held by the narcotics squad. Police procedure required any withdrawal of narcotics to be entered on a log by both the property officer and the narcotics officer, with another double entry being required when the drugs were returned. The log record, introduced into evidence over objection, showed that the drugs in question were signed out of the property room for one day, with the indication that they were to be tested by the police lab.

The police department's forensic chemist next testified that he had examined the drugs on the day they were signed out and determined that of the 85 packets, 21 were cocaine and 64 were heroin.

Thurman's testimony in defense was that the apartment was not his but rather that of his brother's girl friend; that he was unaware of the presence of the narcotics; and finally that the packets had been discovered under the bed rather than under the pillow.

At the close of all evidence, the defendant moved for discharge on the grounds that the affidavit stated that the offense occurred on November 14, 1972, which was in fact the day *after* the trial.

The motion for discharge was overruled, and the State was allowed to reopen its case in chief and to further amend the affidavit to show the correct date.

Thurman was convicted on both counts and received a sentence of from two to ten years on each count.

Thurman raises the following questions on appeal:

1. Did the trial court err in not granting Thurman's Motion for Discharge on the basis of the misdated affidavit and in permitting a corrective amendment by the State?
2. Was the warrantless search improper?
3. Did the State establish chain of custody?
4. Was the evidence sufficient to support the convictions?

## I

AMENDMENT OF AFFIDAVIT WAS PERMISSIBLE AT CONCLUSION OF ALL EVIDENCE TO CURE STATEMENT OF IMPOSSIBLE DATE AS DATE OF OFFENSE WHEN DEFENDANT HAD NOT MOVED TO QUASH AFFIDAVIT PRIOR TO TRIAL COMMENCEMENT

Thurman cites as support for his argument *Pagotis* v. *State* (1938), 214 Ind. 697, 17 N.E.2d 830 and *Shonfield* v. *State* (1925), 196 Ind. 579, 149 N.E. 53. These cases hold that a charge which alleges the commission of a crime on a date subsequent to the filing of the charge is vulnerable to a motion to quash. We have no quarrel with the principle thus enunciated.

A reading of the *Pagotis* decision, *supra*, might lead to the erroneous assumption that the Motion to Quash in that case was not filed until the prosecution moved to amend the indictment at the conclusion of all the evidence. In this regard, the following language from *Pagotis* is misleading:

> "At the conclusion of the evidence and before the jury was instructed, the prosecuting attorney asked leave of court to amend the second count by changing the date of the commission of the alleged offense from 1936 to 1934. Leave was granted over objection and the amendment was made accordingly. The appellant saved the question by motion to quash, made prior to the amendment; a motion for a new trial; and a motion in arrest of judgment." 214 Ind. at 698.

An examination of the transcript of record in *Pagotis*, however, discloses that in fact the Motion to Quash was filed timely, i.e., prior to commencement of trial.

The case before us is quite different. No motion to quash the allegedly faulty affidavit was made. Thurman allowed the trial to proceed until both sides had rested. He voiced his objection only at the penultimate moment. The record reveals no motion to quash or other challenge to the patent defect, other than his Motion for Discharge made at the conclusion of the evidence.

In *Brown* v. *State* (1970), 254 Ind. 504, 260 N.E.2d 876, 877, the defendant alleged that the indictment failed to charge a public offense. Thurman asserts that an allegation of an act taking place on a future date likewise fails to charge a public offense. The Supreme Court in *Brown* stated:

> "The issue is not properly before us since no motion to quash the indictment was made. * * * It is well settled in this State that an attack on the indictment must be made before trial. There is a logical rational reason for this. If the indictment is defective there will be an opportunity to amend before trial, and expense and time-consuming efforts in a trial will thus not be lost. Another sound reason for such a rule is that a party should be required to promptly raise error in the trial court at the time it occurs rather than remain silent, hoping for an acquittal, and if that does not occur, then raise the question of error for the first time. These reasons have previously been enunciated by this Court and should not require further elucidation. Alderson v. State (1929), 201 Ind. 359, 168 N.E. 481; Turner v. State (1968), 249 Ind. 533, 233 N.E.2d 473; Knapp v. State (1932), 203 Ind. 610, 181 N.E. 517. The question as to the sufficiency of the indictment is not before us on this appeal."

The rule thus stated is applicable, as well, to affidavits. *Noel* v. *State* (1973), 157 Ind. App. 338, 300 N.E.2d 132; *McGowan* v. *State* (1973), 156 Ind. App. 344, 296 N.E.2d 667.

It is our further view that here the misstatement in the affidavit as to the date of the offenses in question was not fatal since both such date is not of the essence of the offenses. *Dixon* v. *State* (1945), 223 Ind. 521, 62 N.E.2d 629; *Boos* v. *State* (1914), 181 Ind. 562, 105

N.E. 117; *Platt* v. *State* (1972), 153 Ind. App. 605, 288 N.E.2d 591. The affidavit was therefore subject to amendment as permitted by the court below. Neither can it be seriously argued that such misstatement misled Thurman in preparation of his defense or in any other way prejudiced him. *See Aikens* v. *State* (1972), 154 Ind. App. 36, 289 N.E.2d 152.

Thurman could not have been misled by the impossible date set forth in the affidavit as first amended. The initial affidavit under which Thurman was charged stated the date correctly; the defense witnesses testified to the events occurring on a particular past date and showed no inclination to discuss events which would occur on November 14, 1972, the day after the trial. There was no testimonial disagreement as to the controlling date.

No prejudice or confusion being shown, it is our opinion that the trial court acted properly in denying the motion to discharge and granting leave to amend the affidavit.

## II
## NARCOTICS WERE SEIZED AS RESULT OF LAWFUL WARRANTLESS SEARCH IN THAT SEIZURE WAS INCIDENT TO ARREST FOR WHICH PROBABLE CAUSE EXISTED

Thurman unsuccessfully sought to exclude from evidence the 85 packets of narcotics seized from beneath the pillow on which his head had rested. He bases his "search" argument upon the assumption that the police officers entered the room, arrested Thurman (allegedly without probable cause) and then conducted a search incident to the "unlawful" arrest. His chronology, however, is mistaken. Testimony, which could have been believed, was that the officers entered the room, arrested Weber, then searched the area immediately surrounding Weber which included the pillow beneath Thurman's head, and after finding the drugs, placed Thurman under arrest. The question is not, under such state of facts, whether Thur-

man's arrest was valid, but rather whether there was an arrest based upon probable cause, incident to which a search was conducted.

The validity of a warrantless arrest depends upon the facts of each individual case. *Weigel* v. *State* (1969), 252 Ind. 464, 250 N.E.2d 368. In order to make a valid warrantless arrest for a felony, a police officer must have probable cause to believe (1) that a felony has been committed, and (2) that the person to be arrested has committed it. *Smith* v. *State* (1971), 256 Ind. 603, 271 N.E.2d 133.

There is no contention that the officers lacked probable cause to believe that a sale of narcotics had taken place. It occurred in their presence and they personally field-tested the narcotics obtained. The question therefore is whether the police had reasonable grounds to believe that the person they intended to arrest had committed the felony.

The officers' testimony makes it clear that they did not expect Weber to answer the door. It appears that until Weber answered their knock, slammed the door in their face and attempted to flee, the officers intended to arrest Thurman whom they reasonably believed to be the regular occupant of the premises. The information possessed by the officers was as follows:

1. Information from a reliable informant that drug traffic was being conducted from the apartment.
2. Information from a reliable informant that Thurman lived in the apartment.
3. Personal observations of Thurman during the past several days entering and leaving the apartment.
4. Personal observation of a sale of narcotics by an occupant of the apartment just minutes before the arrest.

Thus, the trial court could reasonably have found that as the officers knocked on the door, they had probable cause to arrest Thurman for the sale they had observed. It is true that the officers' belief that Thurman had conducted the sale was mistaken. However, ultimate

truth is not the test of probable cause, nor is it necessary that the officer have information sufficient to convict the arrestee. *Capps* v. *State* (1967), 248 Ind. 472, 229 N.E.2d 794, *Mc-Gowan* v. *State, supra.*

When Weber, instead of Thurman, came to the door, refused them admittance and fled, two alternate hypotheses became tenable. Either the officers still had probable cause to arrest Thurman, or Weber's actions created a reasonable belief that Weber had made the sale, which could act as a counter-indication as to Thurman's involvement.

Weber was arrested as he stood beside the bed upon which the narcotics were found. The narcotics were thus in an area within Weber's immediate control. The search was therefore within the permissible scope incident to a lawful arrest. *Smith* v. *State, supra. Bryant* v. *State* (1973), 157 Ind. App. 198, 299 N.E.2d 200. If, on the other hand, the arrest of Weber was without probable cause, probable cause necessarily remained extant for Thurman's arrest.

Since a search incident to a lawful arrest may precede the actual formal arrest,[2] *Smith* v. *State, supra,* and the narcotics were under the pillow upon which Thurman's head rested, we perceive no legal consequence under the latter hypothesis different than that flowing from the first hypothesis.

Under either or both of the hypotheses, the officers had probable cause to make an arrest; such arrest was not a pretext arrest; and the search was conducted within the scope permissible. (*Compare Ludlow* v. *State* (1974), 262 Ind. 266, 314 N.E.2d 750.) We therefore hold that the evidence was not inadmissible as the product of an unlawful search.

. 2. In fact, Thurman contends on appeal that his arrest occurred prior to the search.

## III

## ADEQUATE CHAIN OF CUSTODY OF DRUGS ESTABLISHED BY TESTIMONY AND BY PROPERLY ADMITTED POLICE PROPERTY RECORD

Thurman contests the admission into evidence of the narcotics seized at the time of his arrest upon the grounds that the State did not establish an adequate chain of custody. He principally asserts that the police property record showing the initial receipt of the drugs on the date of the seizure and arrest, a withdrawal for testing purposes and return within one day in January, 1972, and a withdrawal for purposes of production at trial, constituted hearsay and that such record was therefore inadmissible.

This threshold contention is destroyed by *Graham* v. *State* (1970), 253 Ind. 525, 533, 255 N.E.2d 652, the key-stone "chain of custody" decision in Indiana, wherein our Supreme Court stated:

> "Ordinarily where the chain of evidence is challenged, production of the record books of the police custody room will suffice. The fact that an out-of-the-ordinary procedure was followed or that oral testimony was required to explain errors in the written police records would go to the weight rather than the admissibility of the evidence."

With respect to a hearsay objection therefore, the admissibility of such property records is established.

When viewed in conjunction with the police property room record, the testimony discloses the following: Officer Robertson, who seized the drugs at the time of Thurman's arrest placed them in the police property room until January 26, 1972 when removed by Officer Mann who gave them directly to Dr. Phillips in the police crime lab. Dr. Phillips tested the drugs. On the following day, the drugs were returned to the police property room by Officer Caine of the police crime lab. The drugs remained in the property

room until the day of trial when Officer Robertson removed them and brought them to court.

Such evidence forges a complete and unbroken chain of custody from the time the drugs were seized until identified in court. The exhibits in question were properly admitted in evidence. (*Compare Mayes* v. *State* (1974), 162 Ind. App. 186, 318 N.E.2d 811.)

## IV

## EVIDENCE WAS SUFFICIENT TO SUPPORT REASONABLE FINDING THAT DEFENDANT WAS IN POSSESSION OF NARCOTICS

Thurman contends on appeal, and he so testified at trial, that he did not live in the apartment where the arrest was made but that it was the apartment of his brother and his brother's girlfriend and that he did not have knowledge of the presence of the drugs which were seized from beneath the bed rather than from beneath a pillow on the bed as testified to by the arresting officer. Thurman argues, therefore, that his mere presence in the room is not sufficient to establish his "possession" of the drugs seized.

At the outset, it must be stated that it was within the prerogative of the court as the trier of fact to accept the testimony of the arresting officer as to where the drugs  were found, i.e., beneath the pillow upon which Thurman had been lying.

Thurman relies upon several federal decisions to support his theory that mere proximity of contraband to an occupant of a room is insufficient to establish possession. His entire argument, however, ignores testimony concerning a confession made by him following advisement of his Miranda rights. This testimony, unobjected to save for an untimely Motion to Strike, was as follows:

"Q. Officer, you just testified that you informed the Defendant of his rights, and my question to you was after

> informing him of his rights, did you have any further conversation with him?
>
> A. Yes, I did.
>
> Q. And what was that conversation?
>
> A. I had a general conversation as to the drugs. Rian Thurman admitted they were his drugs. He was selling them, and if we would not place the charges of possession of heroin and cocaine against his girl friend, that he would help us 'do his man.'
>
> Q. What does that mean—'do his man'?
>
> A. He would—he would turn us over the man that he was dealing for.
>
> Q. All right, Officer, did you at any point have any subsequent conversation with the Defendant?
>
> A. We—we told him that if he would do this that we would place her under arrest only for common nuisance and the next day in court we would in fact ask for a low bond so he could get out of jail and a low bond for her, which we did. They were placed under a very low bond and he subse—subsequently skipped and went to New— New York."

Furthermore, even without regard to the confession which Thurman claims was rendered inadmissible as the product of a coercive plea-bargain, the facts were such as to justify a reasonable finding of possession. It is difficult to accept appellant's contention that he was unaware of the presence of the drugs. It is factually unlikely that *85* packets of drugs located beneath a pillow upon which one's head rested would go unnoticed by that person. The trial court was justified under all the circumstances in finding that Thurman was in possession of the drugs seized. *Ledcke* v. *State* (1973), 260 Ind. 382, 296 N.E.2d 412; *Thomas* v. *State* (1973), 260 Ind. 1, 291 N.E.2d 557; *Greely* v. *State* (1973), 158 Ind. App. 212, 301 N.E.2d 850; *Corrao* v. *State* (1972), 154 Ind. App. 525, 290 N.E.2d 484.

Judgment affirmed.

Buchanan, J., concurs; White, J., concurs with separate statement.

CONCURRING STATEMENT

WHITE, J.—In concurring, I wish to emphasize that the court's opinion does not imply approval or disapproval of the warrantless and forced entry into appellant's apartment. That issue is not before us. Nor does it imply that the unsuccessful effort to contact one of the many judges in Marion County obviated any necessity which might otherwise have existed for first obtaining a warrant.

NOTE.—Reported at 319 N.E.2d 151.